There are two primary issues presented before the court today. First, petitioner requests the court to overturn the immigration judge's adverse credibility determination. And second, petitioner requests the court to determine that he is not inadmissible based on the material support ground of inadmissibility. Am I correct that if he contributed money to a terrorist group and that's why the BIA said that he was ineligible, that we have no jurisdiction, we have to dismiss, and because of our lack of jurisdiction, we cannot review the adverse credibility determination? Actually, Your Honor, he didn't provide money to a terrorist organization to begin with. He actually provided involuntarily support in the form of food and shelter to a militant organization. That's not a material difference, is it? Yes, I believe it would be. But regarding the jurisdictional element, which goes to your question, this would actually be resolved by the Bellout v. Ashcroft case, which held that Bellout v. Ashcroft, and in that case, the court, the Ninth Circuit, determined that, yes, there is a factual, if the issue is factual, the court would be barred from it, at least in as far as it determines the asylum claim, but the court does have jurisdiction to hear the withholding claim, even if it is a factual claim. However, the REAL ID Act, which was passed after the Bellout case, reaffirms this court's jurisdiction to hear a case that involves a constitutional issue or an issue regarding statutory interpretation. Constitutional or legal, fine, but if it's a question of whether or not he contributed material support to terrorist organizations, wouldn't that be factual? Well, no, it would actually be a legal interpretation because we're actually asking the court to interpret whether or not there's a duress exception within the material support. Your argument is that he is not barred by the terrorism exception, which would affect our jurisdiction, because he has a defense of duress. That's correct, Your Honor. And you're asking us to recognize for the first time a duress exception to the material support of terrorism. That's absolutely correct. Let me ask that a different way. Does that mean you're conceding that he would be inadmissible for asylum but for duress? Yes, he would be inadmissible because, as the facts are on the record, he has admitted that he and his family provided shelter and food to militants on three occasions in India. What's the significance of your credibility argument if you concede that? The significance of the credibility argument would go directly to the issue of whether or not he actually has suffered persecution, and we're claiming that he was credible and eligible for asylum. Once we've proven that, the government would then assert the bar, but because there isn't a duress exception within the material support bar, that he would be eligible. That is our stance, Your Honor. It might be dense. I don't understand. It seems to me if you're conceding that he would be not entitled to asylum because he has contributed to supporting a terrorist organization, then that would mean maybe his credibility would be an issue as to whether he proved duress. But what else would it be relevant to? Because it seems to me if you've crossed that first threshold and you've conceded it, we don't get into we can't judge credibility in the first place. It seems like you've already conceded except to the extent that duress may be a defendant. Right. We're – our claim lies on the fact that he – that this Court must interpret the statute to include a duress exception. I want to follow. I don't really understand, I guess, exactly what the basis is for the duress. He admitted he contributed money, that he housed them, that he helped at meetings, and I didn't really get, number one, exactly what the duress is, and number two, why that turns it into a legal issue as opposed to a factual issue. The BIA can judge duress factually, whether it's there, just as a jury would. Well, Your Honor, again, I respectfully request you to look to the record in that he didn't provide money. Again, he only provided – It can be money or any number of other things. I don't see why it matters. Okay, very well. Again, this Court does have jurisdiction to hear the factual issue regarding the material support bar insofar as you're considering the withholding of removal issue. If it's a factual issue – Are you talking about the Convention Against Terror relief? No, I'm discussing withholding of removal, a separate relief, Your Honor. And so this Court does have jurisdiction to hear the factual issue with withholding. If this Court deems this issue is only a factual issue, then, yes, you're correct. The statute precludes jurisdiction over the asylum issue. However, we are arguing that this Court must read the statute, the plain meaning of the statute, in a way that does not bar a victim of terrorism who has provided support under duress to be precluded from admission to this country. Counsel, before you get – before you – I'm going to be very interested in hearing how you get a duress defense here. But was that question decided by the BIA? And if not, why aren't we obligated to send this back to the BIA under Ventura for the BIA to consider that in the first instance? The BIA summarily affirmed the immigration judge's opinion and did not reconsider the Real ID Act implication. Did you raise the duress defense before the BIA? Yes. We have raised the defense exception or defense at all three levels, the – in front of the immigration courts and the BIA. And so is it your – is it your contention, then, that the BIA has implicitly decided that there is no duress defense, or did the BIA decide that as a matter of fact that you didn't have a duress defense here? Because that will affect the way that we have to view this case, won't it? Yes. Well, the BIA was silent as to whether they were considering the facts or the legal analysis here. So we would argue that it would be necessary for the court to remand if it determines that the – Did you raise the duress defense before the IJ? Yes, Your Honor. And what did the IJ find? The IJ found that he – that there was no duress exception. Did he find that as a matter of law or did he find that as a matter of fact? He found that as a matter of law. What pages are you talking about? The IJ's decisions. Sure. One moment here. We're looking at page 87 of the administrative record. Okay. So that's page 31 of the IJ's decision? Yes. He mentions the U.S. Patriot Act. He mentions 241B3B4 of the act. And he – Where does the district – where does the IJ mention the word duress? Let's see where he discusses duress. He mentions the Patriot Act and how it expands the grounds of inadmissibility for material support. I see that. And he goes to the fact that the Patriot Act now precludes anyone who knowingly affords – or who affords material support whether they know so or not. Now, where does he say that? Page 88 of the administrative record. Where's any discussion of any evidence that there might have been regarding duress and what the IJ thinks of it? I just didn't see it. Well, the evidence in the record is going to be at – I can cite portions of his testimony in the administrative work. Why don't you just summarize what the guys say that the bad guys did to him. Very well. And then tell me a page number. And then tell me what the IJ said about it. And give me a page number. Okay. And really speed this up. Sure. Administrative record at page 127. The petitioner explains that the militants came to his house on three occasions. All three times they had guns. The first two times they were carrying them under blankets and were threatening and scaring. Not that, but he supported Khalistan himself. He's on their side ideologically. So why would they have to do anything to him? Well, he didn't ever support any militant activities, Your Honor. This petitioner supported generally the legal party. Why did they say they did anything to him? They did anything to him. They pointed the gun at his father's temple and told him that they would kill him if they didn't provide support to them in the form of housing and food. And that is the reason that they gave support to him. That's at page 126 of the administrative record. Okay. Now we're getting somewhere. They told him, if you don't give me food and shelter, I can kill you, is what the petitioner says. And I quote that at page 126 of the administrative record. On the first two occasions, they further came to the house. They had guns underneath the blankets, and I quote, they were threatening and scaring him. No, we don't know that they had guns under the blankets, do we? Actually, they do because of the manner that they were using. They were directing the guns. Do we know that they were guns under the blankets or do we know that they had something under blankets which he assumed to be guns? The latter, Your Honor. Okay. So we don't know that they were guns, but he thought that they were guns. That's correct. That's like me holding something in my pocket and pointing something that looks like it could be the barrel of a gun out of my pocket, but you are just guessing whether it's my finger or whether it's a gun. Guessing no because of what they had told him, Your Honor. He knew that they were guns. Okay. Did he see guns on any one of the three occasions? The third occasion, they actually took the guns out and pointed it at his father's temple and told him that if they did not provide him with the requested form of support that they would, in fact, heal his father and steal everything that belonged to his family. Now, where's the I.J. talk about that? Now, the I.J. doesn't actually discuss those particular facts. What he does is he assumes, first of all, that he's incredible, second of all, that it doesn't matter whether or not it was under duress because anyone who knowingly affords material support, according to the immigration judge, is barred. So he doesn't actually fully consider the duress exception. Assuming we can reach that issue about whether there's a duress exception. I'm sorry, I can't quite hear you. Assuming we were to reach that issue as to whether there's a duress exception, what would be the authority for finding that? We looked a little bit at the legislative history and it seems that the Attorney General is given the authority, at least on the legislative history, to not apply that section to someone who's materially supported terrorism and that that power would be something that's in the executive. And why would we be finding that as opposed to concluding it's something the executive has control over? Well, first of all, a plain meaning of the statute doesn't resolve the issue. If you look at the statute, it says to provide or to support or to provide material support. But the terms provide or to support, they imply deliberate action. There's a voluntary illness that's part and parcel of the statute here. So we don't know just reading the statute whether Congress intended this. We know if we look at the congressional history of the Real ID Act, they didn't mention this. No one in Congress mentioned this because this act was passed rather quickly through Congress and no one actually went to the intent requirement here. Couldn't you say that Congress's intent may have been that the Attorney General has the authority to apply a duress defense because in the legislative history they say the Attorney General has that authority? I shouldn't use the word duress, but I mean to not apply this particular section. I would say if Congress would have intended that, they would have explicitly said so in the statute by saying anyone, any alien who affords support, whether voluntary or involuntarily, is barred from asylum or barred from immigration benefits. If they so intended, they would have either talked about it during their legislative debate or they would have put it in the statute itself. They didn't do that here. So it's proper for the Court to use canons of construction that have been employed by the Supreme Court and the U.S. Court of Appeals for the Ninth Circuit in that Congress, that you must construe the statute in a way that doesn't lead to an absurd result. This here would be an absurd and a futile result. Congress did not intend to bar victims of terrorism who provided support under duress from receiving benefits. They're no threat to the U.S. population. The definition that the Department of Homeland Security is advocating is overbroad and goes way beyond Congress's intent. Secondly, there's another canon of construction that this Court has used consistently in as recently as 2005, and that statute should be construed in a way that ends up in favor of the alien. And this statute, as the Department of Homeland Security advocates, is absurd and futile in that it would contradict both the purpose of the Immigration and Nationalization Act, and it would also be inconsistent with international law. The U.S. has signed the Refugee Convention, and in Article 33 of the Refugee Convention, we have obligated ourselves to our country to allow legitimate refugees into this country unless they are a threat to this country. If you interpret the statute to exclude someone who is not a threat to this country, and just because we determined that Congress intended to include victims of terrorism in this definition, then that would be inconsistent with our international treaty obligations. It's because the plain meaning of the statute — Let's say we agree with you on all that. Okay. So we've reached a rest if there's credibility. Let's say we think that there's a question that we have jurisdiction over there. On credibility, why wouldn't we still sustain the BIA? The dates and the crowd size did not impress me much, but the difference between three visits and 72 visits from the terrorists, that's a big difference, and it goes to the heart of the claim. Also, the fact that he has no beard and does not present himself as a Sikh and influenced the IJ and BIA and influences me. Why wouldn't that be enough? Very well. Well, first of all, the leading case here is Singh v. Gonzalez, Jarnell Singh v. Gonzalez, 2005 out of the Ninth Circuit. This case said that under certain circumstances, documents from an asylum officer are not substantial record evidence upon which an IJ may base an adverse credibility determination. Here, the IJ wouldn't allow a petitioner to cross-examine the asylum officer. He ignored his explanation for what was asked and answered during the asylum interview, and he failed to verify the reliability of the translation during that interview, despite petitioner's statements that he believed that the translator didn't convey his message to the asylum officer effectively. Here, petitioner testified that with regard to the 72 visits, he never said 72 visits. The asylum officer asked him, during which intervals did the militants visit you? He said that they came at one or two months. That's what his testimony was, meaning they came one or two months the second time they visited him, one or two months after the first time. The asylum officer misunderstood this testimony, and he himself calculated 72 visits. Petitioner never said that. It was a clear misunderstanding at the asylum office, and there's nothing in the record which tells us what was actually asked and answered. The notes are not comprehensive. They're scribbled notes. And if you look, I'd really like the Court to look at Administrator Record 247, which is the asylum officer notes. It's pretty clear to me. I'm looking at them right now. Your Honor, I'd like you to look at the question marks where he talks about the 72 visits. He puts the 72 times in parentheses and has dots before and after in question marks. We don't know what was asked and answered from these notes at all. It appears that because he put it in parentheses that it's consistent with petitioner's testimony. But more important than this. A couple of times a month for three years seems to have been the testimony. It's what the asylum officer understood. We don't know what was asked and answered, Your Honor. And further, under Chinn. Our law does allow somebody to get around what he said to the asylum officer in some circumstances, but that doesn't mean that what he said to the asylum officer doesn't count in any circumstances. That's correct, Your Honor. But here, the way that the immigration judge precluded the petitioner from allowing his attorney to cross-examine the asylum officer here when there was serious doubt as to what was actually said and asked of him at the interview is a violation, I believe, of his due process rights. It fundamentally deprived him of a fundamentally fair hearing. Counsel, before you sit down, I know we've consumed a lot of your time. Can you point in the administrative record to where you raised an arrest offense before the BIA and before the IJ? That question briefed fairly before the BIA. If you don't mind, I would like to reserve that, and I'll find it in the record. I would be happy if you could provide me the record sites. Thank you. Good afternoon. May it please the Court, I'm Lara Krupp on behalf of the U.S. Attorney General, and I also have with me here today Chris Fuller as co-counsel from the Department of Justice. Petitioner had a full and fair opportunity to present his case. He had an asylum in his home. Let's get to the meat of it. Yes, Your Honor. First of all, on duress, did he present it? Was it ruled upon? Did he appeal it to the BIA? Was it ruled upon? The BIA did not rule upon it. They summarily affirmed. The immigration judge did not mention duress in his opinion at all. He did not rule upon it. The IJ didn't mention duress. He went on credibility? Yes, he did. Was it raised but just not addressed? Petitioner did raise duress, I believe, in his brief to the BIA and in his brief to this circuit as well. He mentioned duress. But to the administrative law judge? During the immigration evidentiary hearing, the immigration judge briefly mentioned it. I think he may have brought it up, or perhaps Petitioner's counsel, and what he simply said was he has seen no evidence in the law that he's looked at for any type of duress exception. But he never mentioned it in his actual opinion. And that would be at the administrative record, page 183, is where the immigration judge mentioned it during the evidentiary hearing. Now, the IJ there was giving an opinion as to the law, that duress wasn't a legal defense, as I understand it. Yes. Did the appellant, in his appeal to the BIA, I know the BIA affirmed summarily, but that didn't answer my question. In the appeal to the BIA, did the appellant argue that the IJ had erred in his legal analysis on the duress? What I believe the appellant argued was that the petitioner was not statutorily barred for engaging in terrorist activities. And in that argument, he mentioned in a few sentences that there was a duress defense, and that's what Petitioner alleged, but that was the extent of the argument. So you're conceding that it was preserved? Yes. And if that's the case, then aren't we obligated to send it back to BIA in the first instance under Ventura to let them decide the question? Your Honor, that would be the case if, in fact, this Court needed to reach that issue, but this Court really does not need to even address that issue at all. The immigration judge's primary finding in this case was that Petitioner was simply not credible, and that finding is supported by substantial evidence. That is, this Court must uphold that adverse credibility determination unless the record requires that we believe Petitioner, and that simply isn't the case. So basically, you're saying if we lack jurisdiction on the record as it stands, then we have to dismiss. But if, on the record as it stands, we have jurisdiction, we don't have to remand to really find out whether we would have jurisdiction if they ruled on duress. That's correct. What the primary finding was was an adverse credibility determination, which this Court clearly — Now, on the credibility determination, what about looking like a Sikh in the 72 visits? The — there are six independent reasons that the immigration judge found, and those are among the reasons. One was — I know that, but I'm asking about those two things. The appellant — I wasn't impressed with the size of the crowd discrepancy. I've been in crowds, and I have no idea how big they are. And I wasn't too impressed with the discrepancy in dates, because it's easy to make a mistake on that. But the three versus 72 visits and not looking like a Sikh, that interested me. The appellant says he wasn't allowed to cross-examine and develop a record, so I'd like to know what the response is. The response here would be, and I know that the appellant cited Singh v. Gonzalez, which is distinct from this situation. Here, the asylum officer, the interview had all the indicia of reliability, because not only was Petitioner under oath at the time, which is not always the case, Petitioner had his attorney present at that very asylum interview, and that's reflected in the record on — Did he get a chance to review the notes? I'm not sure that he did have a chance to review those notes. Well, what's the reason that there was no cross-examination permitted? I'm not sure why there was not. His attorney was present at that interview, and that's reflected in the record on page 175. He did have his attorney there. He was under oath, and he did have an interpreter, which he told the immigration judge that he did understand what was going on in that proceeding, because the immigration judge did question the Petitioner during the evidentiary hearing. He did confront him about the inconsistencies in the record and did give Petitioner a chance to explain, and I believe that's on 156 of the record, where the judge confronted Petitioner and asked him, and he said, I had my attorney and I did understand and I was under oath. And there was simply no plausible explanation from Petitioner as to the significant inconsistencies. What is — I'm confused about the argument that the IJ would not let the Petitioner cross-examine the asylum officer. I'm not aware when the Petitioner asked for the cross-examination or how that process worked in this case, but I do know he had his attorney present. I can't remember. Did the asylum officer testify before the IJ? No, Your Honor. There was no occasion to cross-examine the asylum officer. Exactly. There was the record, and that was all that was in front of the immigration judge. The only — Was the record just the notes? Is that what you're saying? Yes. And there was also a typed record as well. This is not a case where somebody testified against the Petitioner, and then the judge wouldn't let the Petitioner cross-examine the witness. No, you're correct. The only person that testified was the Petitioner himself in front of the immigration judge. At the pages you pointed out, 156 and again on 157, Mr. Singh says that he told the interpreter that he explained that he meant that the interval between when the KCF came was two to three months, not that they came two to three times a month over the course of three years. And he said he didn't know whether the interpreter had relayed that to the asylum officer or not. Well, the problem with that is the Petitioner said to the asylum officer they began coming in 1995. I believe he said May of 1995. They continued to come for three years until 1998. The asylum officer then said, well, three years, do you mean 98? Do you mean 99? I think he initially said 96, to which Petitioner simply made no response. So he was given, in addition to the one month or two months, another opportunity during the asylum interview with his attorney present to clarify what he meant. So even, you know, there's the problem with the three versus 72, there's an additional problem, which is that the KCF terrorist group continued to visit him, according to Petitioner, up through 1998 at least and possibly 1999, depending on what exactly he meant, which is a huge problem because after that point the police had already informed him that he should come to the police if these terrorists visit him again, that these terrorists had in fact shot a security guard, that these terrorists had in fact robbed a bank. And thus, if the visits were continuing, three, 72, whatever the number, through 1998, possibly 1999, that's also a significant difference which Petitioner simply didn't address. And moving to another inconsistency in his testimony, which are the dates, Your Honor, which you had some difficulty understanding why this would be important. The immigration judge's concern was that initially Petitioner said on November 21st, and he said this in his declaration, there was a rally, he attended a political rally. He then subsequently changed it to January 21st. So he solidified he was at this rally January 21st. Well, his father in a sworn declaration said Petitioner was arrested January 1st. Petitioner as well told the asylum officer January 1st. Subsequently, at the immigration judge's evidentiary hearing, he then said January 21st. And the immigration judge's concern was the date was changed so that he was arrested on the same day as the rally, and thus to enhance his claim of persecution is why that date changed. And that's why the immigration judge pointed that out. But that is one of several inconsistencies. In addition to the rallying numbers, Petitioner told the immigration judge at his evidentiary hearing, in response to a question, do you belong to any political or religious organizations, he told the immigration judge, no, I do not. And that's reflected in the record, I believe, on page 122 of the administrative record. All right, so I want to make sure I understand this right. He changed the date from November 21st to January 21st. That's the date of the rally. Absolutely. Then he changed it. His father said that he was arrested on January 1st. And Singh then said that he was arrested on January 21st. And your theory, the government's theory, is that he changed the date on which he was arrested to January 21st because that would then coincide with the date on which he said he attended the rally. Yes, that's correct. And the immigration said simply that he believed that this change in date was to enhance Petitioner's claim of persecution. In addition, the immigration judge said twice in the record, this Court does not know what to believe with regard to Respondent's testimony. The immigration judge says that on page 83 of the record, and then he says that on page 67 of the record. This Court simply does not know what to believe. What was the explanation for why he doesn't wear a beard and the other accoutrements of a Sikh? I don't believe he gave an explanation. I think it was the type of Sikh religion that he espoused was my understanding from reading the record, that he didn't follow, I guess, all of the 5Ks or didn't have the hair and beard, and that was simply his choice or the version of the religion that he followed. And that was his explanation. The immigration judge's finding of adverse credibility should be upheld. It is his primary finding. Was there further material in the record about whether there is, in fact, such a group within his religion that doesn't follow the 5Ks? I just never heard of a Sikh not following the 5Ks. There was nothing about that in the record at all, Your Honor. If you ask a Jew why he's not wearing a yarmulke, he'll say, I'm Reform. And there really is a Reform sect, and they don't wear yarmulkes, and everybody can verify that. I just never heard of a Sikh not following the 5Ks, and I want to know if there's any more about that. There's nothing in the record about that. There's nothing more. Simply Petitioner's statement that he did not, and that was it. The immigration judge additionally found that the lack of corroborating evidence, particularly medical evidence, was troubling in terms of Petitioner's credibility. Petitioner did have a doctor in the United States that he saw. In fact, he had a note from this physician because he had missed a hearing in front of the immigration judge, but he never saw a physician in the U.S. to verify his injuries. And the immigration judge found that given the alleged injuries, there would be evidence for a doctor to look at in this country. Furthermore, he had no evidence of any of the alleged hospital stays from when he was back in India. Finally, the immigration judge found that his story was implausible, in addition to the inconsistencies, because the country conditions simply do not support that story. Given all of these six different factors, including the three inconsistencies that go to the heart of Petitioner's claim, the immigration judge found him not credible, and this Court should not overrule that finding unless the record requires this Court to believe Petitioner, and that's simply not the case here. Because Petitioner is not credible, he is not eligible for relief. The adverse credibility determination goes to asylum, withholding of removal, and his cat claim. Counsel, let's assume that we thought that there was some sort of room for negotiating between the 72 versus the 3. If we thought that, if we were of the opinion that Mr. Singh had been visited on three occasions by the KCF, what should we do with respect to the duress claim? Well, even if this Court was able to move beyond the credibility argument, even if this Court was able to believe Petitioner, the terrorists visited him. He invited them into his shelter on his property where he sheltered them. He knew they were running from the police. He stayed there. He sheltered them. And they believed that they were armed, and maybe they even knew what the police knew, that they'd been running around robbing banks and killing security officers. I mean, they would have reason to fear them, and if they saw blankets that looked like they were covering suspicious objects, one wouldn't necessarily have to fault them for not demanding that they be shown what was under the blankets before they helped them out. Right. The problem here is even if we could believe Petitioner, we just don't know what to believe, and the immigration judge was in the same position, unable to reach the duress question at all, because the IJA did not know what to believe. The facts are just so muddled and unclear. The story is so not credible that we have no facts to work with whatsoever. However, there is, if you were even to believe him, there is simply no duress exception in the law. Okay. But is that for us to decide in the first instance, or should we send that back to the BIA under Ventura? In this case, that would have to be remanded to have factual findings on this issue, particularly given the adverse credibility findings. Not just factual findings, but a legal determination as to what the law requires, right? Yes, Your Honor. Okay. So if we were to decide that we had to get the duress question, then we need to remand it to BIA. Yes, Your Honor. In sum, this court needs not reach that issue. This case was about adverse credibility. The immigration judge's findings on adverse credibility are supported by substantial evidence. The record does not require that we believe Petitioner. Let me just ask one summary question. If you were trying to figure out what the IGEA, administrative law judge or immigration judge, found was incredible, would it be that he found it incredible that he did not support terrorist groups or found it incredible that he was acting under duress? And what would you say was that part of the testimony that was not credible so that we would find it was material and, therefore, we could not review it? What the immigration judge found to be not credible was his entire story. That is, even going up to the duress claim, whether, in fact, he was under duress, how many times these terrorists came to his house, over what time period. But additionally, what the immigration judge also found to be not credible was the treatment that Petitioner allegedly suffered, the rallies that he attended, the alleged arrests. There is simply an adverse credibility finding for all of those facts, and the immigration judge really did not know what to believe. So it does go to not only the duress issue but also his claims of alleged persecution. I think he also said that, according to the country report and the other evidence, that the Sikh militancy was all over before the incidents that Petitioner testified to. Was that one of the things that the IJ considered in determining credibility? Yes, it was. The IJ did consider the country report as a general context and background and found that Petitioner's story was additionally incredible given the country conditions in that report and given the fact that if this militancy didn't exist, how could he have these interactions with them? If Sikh participation in elections was high, if other Sikhs were not facing persecution, if the Akali Dalman party, which Petitioner was allegedly supporting, was winning seats from the mid-'90s, 1994, 1996, 1997, in the national parliament, then how could this story hold together? That was another factor in the immigration judge's findings. Would you conclude from the record that the immigration judge found the claim of duress incredible so that there wouldn't be anything to remand because included within the things he found incredible were the claims of duress? Yes, the immigration judge did not know what to believe and simply could not make any factual findings around that claim or any other claim given the fact that the facts were unclear, that they were inconsistent, that they were not credible, that dates were changing, that Petitioner was not only contradicting his own testimony under oath at the asylum interview, but he was also contradicting his father's own sworn declaration, and this was to all the facts. Thank you, Counsel. Thank you, Your Honor. Take 30 seconds or so and wind up. Thank you. I'd just like to show that the administrative record 166, the top of 167, is the portion of the record where Petitioner's attorney asked for an opportunity to cross-examine, and the judge notes that he will not allow the petitioner to cross-examine the asylum officer because the government was not able to cross-examine his witnesses. Was the asylum officer there? He could have been there, Your Honor. That's the point. The petitioner's attorney requested it. Do you get to subpoena witnesses in these proceedings? No, but it's common practice in immigration courts, Your Honor, to have these asylum officers present to testify, and they do so telephonically as well. Was there a request prior to the hearing from the defense that the asylum officer be present? Well, the Department of Homeland Security, the way it works in immigration courts is often the Department of Homeland Security literally surprises the petitioner when they enter into evidence at the last minute, the documents from the asylum officer. And at that point, you request an opportunity to cross-examine, and if they're available, the judges almost always ---- Look, this happens all the time outside the immigration context. There's a witness that you think and hope will testify for the other side because you're loaded for bear on that witness. But if the lawyer on the other side is smart, he never puts the witness on. So what you do to protect yourself is you subpoena that witness before the hearing. I gather from what you're saying you can't subpoena witnesses in these immigration hearings. They usually put the asylum officer on. However, if you think the asylum officer was going to be valuable to you, that would lead to two inferences. Number one, they may be smart enough to figure that out and not have him there. Number two, I want to request prior to the hearing that he be available. And was that done? Well, that would ---- your argument, Your Honor, actually goes against the main principle in Singh v. Gonzalez, which says ---- I'm not really making an argument, and I'm not talking about the law. I'm trying to find out facts at this point. Right. Was a request made that the asylum officer be available? It was made at the regular hearing, Your Honor. And that was at page 166 of the administrative record. And the denial and the reasoning of the immigration judge is at page 167 of the administrative record. But it was not done before the hearing, so it would have led to delay. Correct. And if I may just address your ---- You're requesting loss of a witness who wasn't there. Correct. Thank you. The petitioner's counsel administrative record, page 182, stated there is clearly an exception for duress built into that law. And the immigration judge, also at page 182, said that he's seen some unpublished cases from the BIA. And based on those cases, he says that there's not a duress in the law. Okay. And then where did you raise it before the BIA? The BIA, it was part of the brief. I don't have the citing at this time, Your Honor. But you're confident it was raised before the BIA? I'm confident that it was, yes. And lastly, I just would like to ask the Court to consider Chen when you consider the adverse credibility analysis, because here, even more important or even as important as Singh v. Gonzales is, he didn't consider his explanations. And this goes to his father's affidavit as well as the 72 v. 3 visits. And under this Court, under precedent of the Ninth Circuit, you have to consider these explanations. It looks as though he considered them and rejected them. I'm sorry? It looks as though he considered them and rejected them. He just thought the man was a liar. He didn't mention their explanations, Your Honor, in his oral decision, especially with regard to the 72 visits. Okay. Thank you. Thank you, Counsel. Gurpreet Singh v. Gonzales is submitted.
judges: Kleinfeld, Bybee, Whaley